1 | Ekwan E. Rhow - State Bar No. 174604
erhow@birdmarella.com
2 | Ashley D. Bowman - State Bar No. 286099
abowman@birdmarella.com
3 | Christopher J. Lee - State Bar No. 322140
clee@birdmarella.com
4 | BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
5 | 1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
6 | Telephone: (310) 201-2100
Facsimile:  (310) 201-2110
7
8 | Attorneys for Defendants and Cross-
Complainants Roy Lee and RL Films2, Inc.

**FILED**
Superior Court of California
County of Los Angeles

12/30/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ C. Cortez _____ Deputy

9
## SUPERIOR COURT OF THE STATE OF CALIFORNIA

10
## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11 | JOHN P. MIDDLETON and THE JOHN
POWERS MIDDLETON COMPANIES,
12 | LLC,

13 |           Plaintiffs,

14 |      vs.

15 | ROY LEE; RL FILMS2, INC., and DOES
1 through 10, inclusive,
16

17 |           Defendants.

18 | ROY LEE; RL FILMS2, INC.,

19 |           Cross-Complainants,

20 |      vs.

21 | JOHN P. MIDDLETON and THE JOHN
POWERS MIDDLETON COMPANIES,
22 | LLC, and ROES 1 through 10,

23 |           Cross-Defendants.

24

25

26

27

28

CASE NO. 19STCV30580

**DEFENDANTS ROY LEE AND
RL FILMS2, INC.'S THIRD AMENDED
CROSS-COMPLAINT AGAINST
PLAINTIFFS JOHN P. MIDDLETON
AND THE JOHN POWERS
MIDDLETON COMPANIES, LLC FOR:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF THE COVENANT
   OF GOOD FAITH AND FAIR
   DEALING;**
3. **INTENTIONAL
   MISREPRESENTATION;**
4. **NEGLIGENT
   MISREPRESENTATION;**
5. **INTENTIONAL INTERFERENCE
   WITH PROSPECTIVE
   ECONOMIC ADVANTAGE; AND**
6. **NEGLIGENT INTERFERENCE
   WITH PROSPECTIVE
   ECONOMIC ADVANTAGE**

**DEMAND FOR JURY TRIAL**

Assigned to Hon. Kevin C. Brazile, Dept. 20

Action Filed:        August 28, 2019

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

Exhibit C(6)

Electronically Received 12/30/2020 01:57 PM

1   Defendants and Cross-Complainants Roy Lee and RL Films2, Inc. ("Cross-

2   Complainants"), hereby cross-complain as follows against Plaintiffs and Cross-Defendants

3   John P. Middleton and The John Powers Middleton Companies, LLC ("JPMC")

4   (collectively, "Cross-Defendants").  All facts herein are stated on the basis of personal

5   knowledge and/or upon information and belief.

6   **INTRODUCTION**

7       1.      In 2010, Roy Lee was already an established Hollywood producer, credited

8   on dozens of hit movies.  Around that time, John Middleton ("Middleton"), son of tobacco

9   magnate John S. Middleton ("Middleton Senior"), came to Hollywood to launch a career

10  as a producer.  Middleton and Middleton Senior approached Roy Lee, and negotiated a

11  deal whereby Roy Lee would allow Middleton to work at his production company, Vertigo

12  Entertainment ("Vertigo"), in exchange for investment (the September 27, 2010 agreement

13  between The John Powers Middleton Companies, LLC and RL Flims2, Inc., or "2010

14  Agreement").

15      2.      When Roy Lee signed the 2010 Agreement, he thought he was giving a

16  promising young producer an opportunity to learn the business, while also securing stable

17  investment for his company.  In reality, Middleton proved to be a significant liability who

18  irreparably damaged Roy Lee and Vertigo, while the promised investment never

19  materialized.

20      3.      Roy Lee and RL Films2 now brings these claims to repair the damage

21  Middleton and JPMC have done to Roy Lee's business and reputation, and receive what

22  was promised under the 2010 Agreement.

23  **PARTIES**

24      4.      Defendant and Cross-Complainant Roy Lee is, and was at all relevant times

25  herein, an individual residing and conducting business in Los Angeles, California.

26      5.      Defendant and Cross-Complainant RL Films2, Inc. is, and was at all relevant

27  times herein, a California corporation with its principal place of business in Beverly Hills,

28  California.

3691201.1

2                                                          Page 2

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

6.      Plaintiff and Cross-Defendant John P. Middleton is, and was at all relevant times herein, an individual residing in and conducting business in Los Angeles, California.

7.      Plaintiff and Cross-Defendant The John Powers Middleton Companies, LLC is, and was at all relevant times herein, a California corporation with its principal place of business in Los Angeles, California.

8.      The true names and capacities of Cross-Defendants Roes 1 through 10, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Cross-Complainants, who therefore sue these Cross-Defendants by such fictitious names.  Cross-Complainants will amend this Cross-Complaint to reflect the true names and capacities of these Cross-Defendants after they have been discovered.  Each of the fictitiously-named Cross-Defendants is responsible in some manner for the occurrences alleged in this Cross-Complaint, and all the damages alleged in this Cross-Complaint were proximately caused by the acts or omissions of these Cross-Defendants.

9.      At all times material to this action, each Cross-Defendant was acting as an agent, servant, partner, and/or alter ego of each of the remaining Cross-Defendants and, in connection with the matters alleged herein, was acting in the course and scope of such agency.  Cross-Complainants are further informed and believe, and on that basis allege, that each Cross-Defendant, while acting as principal, expressly acted with the knowledge of the other Cross-Defendants and/or expressly directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Cross-Defendants.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action because each Cross-Defendant has been doing business in the State of California within the time period relevant to the causes of action stated herein; is, or at all relevant times was, a resident of the State of California; and/or purposefully directed tortious activities towards California residents.

11.      Venue in this Court is proper pursuant to California Code of Civil Procedure §§ 395, *et seq.*

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

## THE 2010 AGREEMENT

12.     In or around 2008, Middleton and his father, Middleton Senior, first approached Roy Lee regarding the possibility of a partnership in which Roy Lee would act as a mentor to Middleton in exchange for investment.

13.     At the time, Roy Lee was already a top-flight producer with over a decade of experience in Hollywood and numerous active deals with various studios, including a "First Look" feature overall deal with Warner Brothers (the "WB Agreement").

14.     Prior to signing the 2010 Agreement, Roy Lee had already launched numerous successful projects including *The Ring* franchise, *The Grudge* franchise, the *How To Train Your Dragon* franchise, and *The Departed*, the winner of Best Picture at the 79th Academy Awards.

15.     Middleton, on the other hand, was a complete unknown in Hollywood with no industry experience or connections, aside from scattered internships at various production companies.  Middleton told Roy Lee that he was looking for a talented producer who could educate him on how to succeed in the industry.

16.     In the course of negotiations for the 2010 Agreement, Middleton made several misrepresentations in order to induce Roy Lee to enter into the 2010 Agreement.

17.     First, Middleton represented that that he would provide regular investment that would cover half of Roy Lee's production expenses.  Middleton made this misrepresentation despite having no intention to follow through with these payments, and despite knowing that his personal income – mostly consisting of distributions from his father's trust fund – would not be sufficient to cover the amount promised.

18.     Second, Middleton represented that he would work closely with Roy Lee and provide substantial production services.  Middleton made this misrepresentation despite the fact that he had no intention of doing any actual work: all he truly desired was the glamorous Hollywood lifestyle, which would allow him to rub shoulders with famous movie stars and executives.

3691201.1

4

Page 4

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

19.     Middleton Senior and his representatives also made similar false representations to Roy Lee on Middleton's behalf in 2010 during the course of negotiations of the 2010 Agreement.

20.     On or about September 27, 2010, relying on these misrepresentations and believing that he was mentoring an earnest young producer who wanted to break into the industry, Roy Lee, on behalf of RL Films2, entered into the 2010 Agreement.  A true and correct copy of this agreement is attached as **Exhibit A**.

21.     The 2010 Agreement was valid for a term running from October 1, 2010 to December 31, 2014.  Ex. A, ¶ B.

22.     Pursuant to the 2010 Agreement, Middleton was responsible for providing Roy Lee and his production company, Vertigo, with investment equal to 50% of production expenses, including "rent of [office space], clerical expenses and other operating costs" (the "Overhead Contributions.")  Ex. A, ¶ C.  Middleton's annual Overhead Contributions were capped at the modest sum of $300,000 per year.  *Id.*

23.     In exchange, the 2010 Agreement provided Middleton with a direct financial return on his investment, in the form of 20% of the producer fees for certain defined projects affiliated with Roy Lee.  Ex. A, ¶ D.

24.     In addition to the financial return, the 2010 Agreement also provided that Roy Lee would designate Middleton as an executive producer on certain projects produced under Lee's existing deal with Warner Brothers, for which he had a right to designate an executive producer, and make "[c]ommercially reasonable efforts" to designate Middleton as an executive producer on certain other projects.  Ex. A, ¶ E.  Middleton specifically demanded that Roy Lee provide him with these executive producer credits.

25.     Middleton further requested that the 2010 Agreement include a representation that Middleton would "be introduced to the film community at the highest levels."  Ex. A, ¶ F.

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

26.     Middleton also demanded, as part of the 2010 Agreement, that Roy Lee and Vertigo sublease a 4,800-square-foot office space in Beverly Hills, Ex. A, ¶ A, and that Middleton be given a "first class" office in that space, *id.*, ¶ B.

27.     Roy Lee believed that the office space designated by Middleton was far too large for Vertigo's needs, particularly given that rent for a space of that size would significantly increase expenses. An increase in expenses would substantially reduce the 2010 Agreement's financial benefit to Roy Lee, as Middleton's Overhead Contribution was capped at only $300,000 a year. *Id.*, ¶ C. Nevertheless, Roy Lee relied upon Middleton's misrepresentations that Middleton fully intended to perform his obligations under the 2010 Agreement and agreed to sublease the office space.

### MIDDLETON DERAILS THE 2010 AGREEMENT

28.     At all times during the term of the 2010 Agreement, Cross-Complainants made a good faith effort to perform their contractual obligations. Moreover, despite having no legal duty to do so, Roy Lee went out of his way to secure additional benefits for Middleton because he sincerely believed he was helping an aspiring young producer gain substantive experience and advance his career. Unfortunately, Middleton had other ideas.

29.     In or around 2011, problems began to arise with Middleton's payment of Overhead Contributions. Middleton's payments were consistently late beginning in or around 2011, became intermittent in or around 2013, and finally stopped altogether in or around 2016.

30.     By the end of their partnership, Middleton had still not paid Roy Lee approximately $88,750 in contractually-obligated Overhead Contributions.

31.     On several occasions between July and October 2013, Middleton's representatives, on behalf of Middleton, made explicit representations to Roy Lee and his representatives that payments would be made on certain dates. In reality, Middleton and his representatives had no intention of making these payments on promised dates. Roy

3691201.1

6

Page 6

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

1    Lee believed and relied on these representations, but the payments did not arrive on time,

2    causing substantial disruption to Vertigo's business operations.

3         32.     In spite of his repeated promises that he intended to pay Roy Lee and Vertigo

4    the money they were due, Middleton instead squandered his personal funds on various

5    wasteful purchases that supported the glamorous Hollywood lifestyle he desired.

6    Middleton associated with numerous club promoters and party planners, whom he would

7    pay large sums of money to organize wild social events at increasingly extravagant venues.

8         33.     Middleton also harmed Vertigo directly by using his corporate credit card for

9    further reckless spending.  As a result, Vertigo's expenses skyrocketed.  Compounded with

10   Middleton's failure to timely make the required Overhead Contributions, this out-of-

11   control spending became a serious financial liability for the company.

12        34.     Out of concern for both his business and the Middleton's personal well-

13   being, Roy Lee made several attempts to gently convince Middleton to cut down on his

14   spending.  In particular, Roy Lee requested that Middleton confer with him prior to

15   incurring any expense in excess of $10,000 on his company card.  Middleton refused.

16        35.     Contrary to his prior representations to Roy Lee, Middleton provided no

17   production services (or any services whatsoever) to Vertigo.  Furthermore, Middleton

18   actively harmed the company by failing to appear in the office, on set, or at meetings,

19   without notice and despite prior commitments to do so.

20        36.     As Middleton's profligate lifestyle became well-known among Hollywood

21   insiders, his involvement in Vertigo also caused substantial reputational harm to the

22   company and to Roy Lee.  On numerous occasions, Roy Lee and others at Vertigo were

23   forced to reach out to apologize for Middleton's behavior.  By early 2013, this had become

24   a massive liability to Vertigo, leading Roy Lee to seriously reevaluate their partnership.

25            **MIDDLETON'S EMBARASSING BEHAVIOR CRESCENDOS**

26        37.     While Roy Lee considered the prudence of continuing his partnership with

27   Middleton, and despite Middleton's averments that he wanted to continue the partnership,

28   Middleton's behavior in the presence of key Hollywood players became increasingly

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

detrimental to the business of Roy Lee, Vertigo, and RL Films2.  In or around May 2013, Middleton invited Roy Lee to join him on a trip to the Cannes Film Festival.  The two of them initially planned to stay at Cannes for two weeks on a Yacht chartered by Middleton, while entertaining several important business contacts as invited guests.

38.     On or about May 17, 2013, three days into the trip, Middleton returned to the yacht black-out drunk after a night out with a group of people he claimed were close friends of actor Leonardo DiCaprio.

39.     After returning to the yacht, Middleton stumbled through a glass door, breaking the door and cutting his hand on a broken shard.  Afterwards, in front of numerous invited guests – including Roy Lee's business contacts – Middleton went into a hysterical fit and started crying.

40.     Middleton's inebriation was such that Roy Lee feared that he may fall off the yacht and seriously injure himself.

41.     Out of concern for Middleton's safety, Roy Lee quickly carried him back to his room and put him to bed.  Subsequently, he contacted Edwin Glaser, Middleton's sober coach, to discuss the situation.

42.     Glaser, in turn, reached out to Middleton Senior, who requested that Roy Lee fly to Boston on a chartered jet to immediately check Middleton into a rehabilitation facility.  Again, out of honest concern for Middleton's well-being, Roy Lee complied.

43.     Afterwards, Roy Lee emailed Middleton Senior to express his concern regarding Middleton's substance abuse issues, and his intention to terminate their partnership should he fail to change his lifestyle.

44.     Around the same time, Roy Lee was informed that after he and Middleton had departed Cannes, an associate of Middleton had made several visits to the yacht claiming that he had been told to do so by Middleton.  This individual made insensitive and vulgar comments that caused extreme discomfort for Middleton and Lee's invited guests – including several important business contacts.

3691201.1

8                                        Page 8

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

45.     Middleton himself had engaged in similar behavior while working with Roy Lee, sending vulgar text messages to one or more high-level film industry executives, indifferent to how poorly his conduct reflected on Vertigo and Roy Lee, as well as on Middleton.

46.     Middleton's self-destructive behavior continued to intensify throughout 2013, further damaging Roy Lee and Vertigo's reputation.

47.     In or around 2013, Middleton became convinced that Molly Shaheen – who he claimed was his girlfriend – was cheating on him.  He hired a private detective from Screen International Security Services, Ltd. ("Screen International") to not only follow Shaheen, but also attempt to hack her phone and emails.  When Shaheen subsequently found out, her family threatened to sue Middleton.

48.     Middleton Senior was forced to intervene, and through his representatives, negotiated a settlement to resolve his son's legal difficulties with the Shaheen family.

49.     Subsequently, Middleton also refused to pay Screen International for their services.  On or about August 14, 2013, the Screen International filed a lawsuit against Middleton in Santa Monica Superior Court, seeking $107,000 in unpaid fees.

50.     As a result of the public filing, Middleton's attempt to stalk Shaheen became common knowledge in Hollywood circles, further damaging Roy Lee's and his company's reputation and driving away business opportunities.

51.     In addition to Shaheen, Middleton also surveilled JPMC employees and subjected them to adverse working conditions—including harassment, inadequate wages, and use of offensive language to and about female employees—during the course of his relationship with Roy Lee, RL Films2, and Vertigo.  This unauthorized surveillance and other improper conduct by Middleton resulted in serious threats of litigation against Vertigo as well as Middleton.  Although Middleton was aware of the threatened litigation and its potential to further jeopardize Roy Lee's and Vertigo's business relationships and financial resources, he intentionally concealed the situation from Roy Lee.  To date, Middleton has not disclosed this matter to Roy Lee.

3691201.1

9

Page 9

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

## **MIDDLETON ATTEMPTS TO MEND THE PARTNERSHIP**

52.     By the end of 2013, as a result of the above-referenced incidents and other concerning conduct by Middleton, Roy Lee decided that he had had enough.  Roy Lee made it clear that he had no interest in continuing his partnership with Middleton.

53.     Middleton, however, was desperate to hang on to his Hollywood lifestyle.  In order to induce Roy Lee to continue their partnership, Middleton falsely represented to Roy Lee that he would make timely payment on his Overhead Contribution, moderate his spending, stop drinking, and substantively participate in Vertigo's productions.  Middleton, however, had no intention of following through on any of these representations.

54.     Middleton also directed Middleton Senior and his representatives to make substantially similar false and misleading representations to Roy Lee on his behalf.

55.     Eventually, relying on these representations, and believing that Middleton truly intended to start abiding by the parties' agreement and pursue the legitimate film career Middleton professed to desire, Roy Lee decided to give Middleton one last chance.  On December 16, 2013, the parties executed an amendment to the 2010 Agreement ("2013 Amendment").  A true and accurate copy of the 2013 Amendment is attached as **Exhibit B**.

56.     The 2013 Amendment extended the 2010 Agreement for a further three-year term, running from January 1, 2014 to December 31, 2016.  Ex. B, ¶ 1.

57.     At least one component of Middleton's commitments to moderate his spending was expressly memorialized in the 2013 Amendment: the parties agreed that Vertigo would move out of its excessively large and expensive Beverly Hills office space, and into an alternative location.  Ex. B, ¶ 2(a).

58.     As soon as the ink on the 2013 Amendment was dry, however, Middleton reverted to his old ways.  Middleton's payments continued to be late, and his behavior grew more erratic.  On or about February 24, 2014, Roy Lee received an angry text message from Middleton accusing him of withholding Middleton's share of producer fees for a project not covered under the 2010 Agreement.  Middleton had no contractual right to

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

1  a share of the fees on this project, but demanded them nevertheless, threatening Roy Lee
2  with foul and disturbing language.

3       59.    In order to amicably conclude their partnership, Roy Lee offered to pay
4  Middleton the following in exchange for immediate termination of Middleton's and
5  JPMC's association with Vertigo: (1) the share of producer fees Middleton was
6  demanding, but to which he had no contractual right; (2) 150% of the overhead expenses
7  Middleton had paid to Roy Lee and Vertigo; and (3) reimbursement for all gifts Roy Lee
8  received during the course of their partnership.  Middleton rejected this offer.

9  **MIDDLETON RENDERS THE PARTNERSHIP UNTENABLE**

10       60.    In or around 2014, Middleton launched a new production company – The
11  Affleck/Middleton Project ("AMP") – with actor Casey Affleck.  Notwithstanding his
12  recent and recurring promises to make payments owed to Vertigo on time and in full,
13  Middleton subsequently began to divert to AMP funds that were contractually owed to
14  Vertigo as Overhead Contributions.  Middleton also began to appear at the Vertigo office
15  even less frequently than he had prior to execution of the 2013 Amendment.

16       61.    Throughout the term of the 2010 Agreement and 2013 Amendment,
17  Middleton had voluntarily provided Vertigo with use of certain sports tickets in order to
18  assist Roy Lee in developing business.  By 2015, however, two members of Middleton's
19  entourage, who were working out of Vertigo's offices at Middleton's request, began to
20  systematically co-opt the sports tickets offered to Vertigo business contacts.  These
21  individuals claimed the tickets for AMP and also for their own personal use.
22  Consequently, on multiple occasions Roy Lee found that tickets he had already offered to
23  important business contacts suddenly became unavailable.  In order to protect his and
24  Vertigo's credibility, Roy Lee had no choice but to cease offering Middleton's tickets to
25  business contacts entirely.

26       62.    Despite taking up office space at the company and incurring substantial
27  expenses, these same members of Middleton's entourage declined to do any work for
28  Vertigo.  Rather, they informed Roy Lee and Vertigo personnel that they were too busy

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

working for AMP.  Ultimately, Roy Lee was forced to ask them to leave, as they were disruptive to Vertigo's business.

63.     Not only did Middleton fail to substantively participate in Vertigo's productions, he stopped showing up to work entirely.  In 2015, Middleton was only at Vertigo's offices twice.  Middleton's absences became so frequent that in or around September 2015, Roy Lee was forced to tell him that he would not give Middleton an Oscar trophy unless Middleton came in person to retrieve it from Vertigo, because Lee believed it was the only way he might convince Middleton to come to the office.  During the entirety of 2016, Middleton did not appear at the office at all, notwithstanding his agreement to provide production services to Vertigo and Lee.

64.     By 2016, Middleton's Overhead Contributions ceased entirely.  At the end of 2016, the sum of Middleton's conduct rendered the partnership completely untenable.  In late December 2016, when Middleton again failed to make an Overhead contribution or to engage in communications or steps required to continue or wind down the parties' Agreement, Roy Lee realized at that point that Middleton did not have, and never had, any intention of honoring the promises he made to convince Roy Lee to execute the parties' contract.  As a result, Roy Lee decided not to further extend the 2010 Agreement upon the expiry of the 2013 Amendment on December 31, 2016.

65.     Casey Affleck also terminated his relationship with Middleton in or around 2017.  Following the termination of his relationship with Casey Affleck, Middleton has continued to inquire about the possibility of working with Roy Lee again.  On occasion, Middleton has even offered sports tickets and other benefits in order to induce Roy Lee to resume their partnership.

66.     Roy Lee has been cordial in his response to Middleton's inquiries out of respect for their long personal association and genuine concern for Middleton's mental health.  However, he has no desire whatsoever to work with Middleton again, given the substantial damage Middleton has already caused to Roy Lee's reputation and business.

67.   In addition, in seeking to re-engage with Roy Lee, Middleton demanded unreasonable terms including, *inter alia*, that he receive production credits on every Vertigo project (regardless of whether or not he did any work), and that he be allowed to operate a competing production company while working at Vertigo.  Middleton's unreasonable demands strongly suggest he had (and has) no intention of changing his behavior.

## FIRST CAUSE OF ACTION

**(Breach of Contract Against The John Powers Middleton Companies, LLC)**

68.   Cross-Complainants hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs, as though fully set forth herein.

69.   The 2010 Agreement and 2013 Amendment are valid and enforceable contracts between RL Films2, Inc. and The John Powers Middleton Companies, LLC.

70.   Cross-Complainants have performed all obligations, conditions, covenants, and promises required of them by the terms of the 2010 Agreement and 2013 Amendment, except those waived, excused, or prevented by Cross-Defendants.

71.   As alleged more fully in the paragraphs above, Cross-Defendants had a contractual obligation to make each Overhead Contribution set forth in the 2010 Agreement and 2013 Amendment.  Cross-Defendants have materially breached the 2010 Agreement and 2013 Amendment by refusing to pay each their contractually-mandated Overhead Contributions in a timely manner beginning in 2016.  While Cross-Defendants' payments of the Overhead Contributions were frequently late, and started becoming sporadic in or around 2013 and through 2015, they stopped entirely in or around 2016, in direct contravention of the parties' agreement.

72.   As alleged more fully in the paragraphs above, Cross-Defendants have further materially breached the 2010 Agreement and 2013 Amendment by failing to provide production assistance to Roy Lee and Vertigo when Middleton ceased coming to Vertigo's offices entirely in 2016.

73.     As a direct and proximate result of Cross-Defendants' breach of contract, Cross-Complainants have suffered substantial damages in an amount to be ascertained at trial.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing
### Against The John Powers Middleton Companies, LLC)

74.     Cross-Complainants hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs, as though fully set forth herein.

75.     The 2010 Agreement and 2013 Amendment are valid and enforceable contracts between RL Films2, Inc. and The John Powers Middleton Companies, LLC.

76.     Cross-Complainants have performed all obligations, conditions, covenants, and promises required of them by the terms of the 2010 Agreement and 2013 Amendment, except those waived, excused, or prevented by Cross-Defendants.

77.     The 2010 Agreement and 2013 Amendment each contain an implied covenant of good faith and fair dealing whereby Cross-Defendants were obligated to refrain from engaging in acts that deprive Cross-Complainants of their contractual benefits.

78.     As alleged more fully in the paragraphs above, Cross-Defendants have deprived Cross-Complainants of the benefits of the 2010 Agreement and the 2013 Amendment, and thereby breached their duty of good faith and fair dealing through, without limitation, the following conduct: failing to make the Overhead Contributions in a timely manner and eventually ceasing to make them entirely, greatly increasing Vertigo's expenses as a consequence of Middleton's outlandish demands and irresponsible spending, damaging Vertigo and Roy Lee's reputation as a consequence of Middleton's erratic conduct during his association with Vertigo and Roy Lee, and diverting funds and resources that should have gone to Vertigo to others, including AMP and Middleton's entourage.

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

79.     As a direct and proximate result of Cross-Defendants' breach of the duty of good faith and fair dealing, Cross-Complainants have suffered substantial damages in an amount to be ascertained at trial.

## THIRD CAUSE OF ACTION

### (Intentional Misrepresentation Against All Cross-Defendants)

80.     Cross-Complainants hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs, as though fully set forth herein.

81.     As alleged more fully in the paragraphs above, Cross-Defendants intentionally made false representations of material fact, or omissions of material fact concerning, without limitation: Middleton's intention, willingness, and ability to make the Overhead Contributions in a timely manner, conduct himself professionally and appropriately when appearing in association with Roy Lee and Vertigo, stop drinking, and provide substantial production services to Vertigo.

82.     Cross-Defendants knowingly made these misrepresentations, omissions, or concealment of material facts, and acted with the intent to induce Cross-Complainants to enter into the 2010 Agreement and extend that agreement by executing the 2013 Amendment.

83.     Cross-Complainants were unaware of the true facts until in or around December 2016, and justifiably relied on these misrepresentations or omissions of fact until that point, as reflected in their continued performance under the parties' agreement until the time of their decision not to extend the parties' contract when it expired on December 31, 2016.

84.     As a direct and proximate result of Cross-Defendants' wrongful conduct, Cross-Complainants have suffered and will continue to suffer substantial damages in an amount to be ascertained at trial.

85.     Cross-Defendants acted willfully, oppressively, maliciously, and in wanton and conscious disregard of the rights of Cross-Complainants.  Accordingly, punitive

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

damages should be assessed against Cross-Defendants in an amount that will be sufficient to discourage him and others from engaging in such misconduct.

## FOURTH CAUSE OF ACTION

### (Negligent Misrepresentation Against All Cross-Defendants)

86.     Cross-Complainants hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs, as though fully set forth herein.

87.     As alleged more fully in the paragraphs above, Cross-Defendants made false representations of material fact or material omissions concerning, without limitation, Middleton's intention, willingness and ability to make the Overhead Contributions in a timely manner, conduct himself professionally and appropriately when appearing in association with Roy Lee and Vertigo, stop drinking, and provide substantial production services to Vertigo.

88.     Cross-Defendants made these misrepresentations, omissions, or concealment of material facts without reasonable grounds for believing them to be true, and with the intent to induce Cross-Complainants to enter into the 2010 Agreement and extend that agreement by executing the 2013 Amendment.

89.     Cross-Complainants were unaware of the true facts until in or around December 2016, and justifiably relied on these misrepresentations or omissions of fact until that point, as reflected in their continued performance under the parties' agreement until the time of their decision not to extend the parties' contract when it expired on December 31, 2016.

90.     As a direct and proximate result of Cross-Defendants' wrongful conduct, Cross-Complainants have suffered and will continue to suffer substantial damages in an amount to be ascertained at trial.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage
### Against All Cross-Defendants)

91.     Cross-Complainants hereby re-allege and incorporate by reference the

3691201.1

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

1  allegations contained in the preceding paragraphs, as though fully set forth herein.

2     92.    Economic relationships existed between Cross-Complainants and various

3  studios, many of which Cross-Complainants had maintained for years prior to the events

4  giving rise to this Cross-Complaint, and from which Cross-Complainants would continue

5  to derive future economic benefit when a studio purchased one of Cross-Complainants'

6  projects.

7     93.    Cross-Defendants were aware that these relationships existed.

8     94.    As alleged more fully in the paragraphs above, Cross-Defendants acted with

9  the intent to disrupt these relationships.  To that end, Cross-Defendants engaged in

10  independently wrongful conduct including, without limitation: failing to make the

11  Overhead Contributions in a timely manner and eventually ceasing to make them entirely;

12  greatly increasing Vertigo's expenses due to Middleton's outlandish demands and

13  irresponsible spending; damaging Vertigo and Roy Lee's reputation with studios and other

14  film and television industry contacts through Middleton's erratic conduct; and diverting to

15  AMP, Cross-Defendants' separate competing production venture, funding, work time, and

16  other resources that had been pledged to Cross-Complainants.

17     95.    By that wrongful conduct, Cross-Defendants intentionally interrupted Cross-

18  Complainants' economic relationships for the purpose of depriving and diverting economic

19  benefits from Cross-Complainants to AMP.

20     96.    As a direct and proximate result of Cross-Defendants' wrongful conduct,

21  Cross-Complainants have suffered and will continue to suffer substantial damages in an

22  amount to be ascertained at trial.

23     97.    Cross-Defendants acted willfully, oppressively, maliciously, and in wanton

24  and conscious disregard of the rights of Cross-Complainants.  Accordingly, punitive

25  damages should be assessed against Cross-Defendants in an amount that will be sufficient

26  to discourage him and others from engaging in such misconduct.

27

28

3691201.1

17

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

## SIXTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Advantage

### Against All Cross-Defendants)

98.     Cross-Complainants hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs, as though fully set forth herein.

99.     Economic relationships existed between Cross-Complainants and various studios, many of which Cross-Complainants had maintained for years prior to the events giving rise to this Cross-Complaint, and from which Cross-Complainants would continue to derive future economic benefit or advantage when a studio purchased one of Cross-Complainants' projects.

100.     Cross-Defendants were aware that these relationships existed, and should have been aware that in their capacity as a business partner to Cross-Complainants, acting without due care would interfere with the relationships and cause Cross-Complainants to lose, in whole or in part, the probable future economic benefit or advantage of the relationships.

101.     Despite this, Cross-Defendants engaged in negligent conduct through their repeated failures to act with due care, including, without limitation: failing to make the Overhead Contributions in a timely manner and eventually ceasing to make them entirely; greatly increasing Vertigo's expenses due to Middleton's outlandish demands and irresponsible spending; damaging Vertigo and Roy Lee's reputation with studios and other film and television industry contacts through Middleton's erratic conduct; and diverting funds and resources that should have gone to Vertigo to others, including Cross-Defendants' competing production venture, AMP, and Middleton's entourage.

102.     As a direct and proximate result of Cross-Defendants' wrongful conduct, Cross-Complainants have suffered and will continue to suffer substantial damages in an amount to be ascertained at trial.

18

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainants pray for judgment as follows:

A.     Compensatory damages and restitution in an amount to be proven at trial for all losses and damages caused by the conduct of Cross-Defendants;

B.     Punitive damages in an amount to be proven at trial for Cross-Defendants willful and malicious conduct;

C.     All costs of suit incurred herein, including reasonable attorneys' fees;

D.     Pre-judgment and post-judgment interest in the maximum amounts provided by law; and

E.     Such other and further relief as this Court deems just and proper.

DATED:  December 30, 2020          Ekwan E. Rhow
                                   Christopher J. Lee
                                   Ashley D. Bowman
                                   Bird, Marella, Boxer, Wolpert, Nessim,
                                   Drooks, Lincenberg & Rhow, P.C.


                                   By:    /s/ Ashley D. Bowman
                                   _____
                                          Ashley D. Bowman
                                   Attorneys for Defendants and Cross-
                                   Complainants Roy Lee and RL Films2, Inc.

DEFENDANTS AND CROSS-COMPLAINANTS ROY LEE AND RL FILMS2, INC.'S
THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON, ET AL.

1  **DEMAND FOR JURY TRIAL**

2      Cross-Complainants hereby demand trial by jury on all causes of action for which

3  trial by jury is available.

4

5  DATED:  December 30, 2020        Ekwan E. Rhow

6                                    Christopher J. Lee

                                  Ashley D. Bowman

7                                    Bird, Marella, Boxer, Wolpert, Nessim,

                                  Drooks, Lincenberg & Rhow, P.C.

8

9                              By:          /s/ Ashley D. Bowman

10                                    Ashley D. Bowman

11                              Attorneys for Defendants and Cross-

                            Complainants Roy Lee and RL Films2, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3691201.1

DEMAND FOR JURY TRIAL

# EXHIBIT A

Proposed Terms Between The John Powers Middleton Company LLC ("JM"), an entity owned by John P. Middleton ("JPM"), & RL Films2, Inc., an entity owned by and providing the services of Roy Lee ("Lee" which shall include Roy Lee and any Lee-controlled entity)

A. **Sublease:** Lee will sublease 9348 Civic Center Drive, Mezzanine, Beverly Hills, CA 90210, approximately 4,800+ square feet. A three year three month (10-1-10 through 12-31-13) sublease from Spitfire Holdings, which is moving. Spitfire would be subsidizing at $0.50/sq. ft, with a starting rental of $17.5K/month, $3.65 sq. ft., $210K/yr, rising to a little less than $19.2K/month in year three. Parking is modest.

B. **Capital Contributions by JM for Overhead :** JM's obligation is, subject to Lee's performance of Lee's material obligations hereunder, guaranteed for 3 and 1/4 years (firm, beginning 10-1-10, assuming the above sublease is entered into – the "Term") ) at 50% of aggregate overhead (100% is estimated at between $450K-$600K per year), but JM's obligation is not to exceed $300K per year (or allocable portion for periods less than a year) . Overhead expenses, which shall be paid proportionately, monthly and in advance, are for rent of the above subleased space, clerical expenses and other operating costs per good faith & reasonable budget (but no personal payments to either Lee or JPM). No development fund.

C. **Office Benefits to JM:** JM will be entitled to one first class office (and access to staff/facilities) at the subleased space during the Term. JM and Lee would each be entitled to 50% of any payments by any "cash paying" subtenants during the Term.

D. **Financial Benefits to JM:** Lee will pay or cause to be paid to JM (i) 20% of the Roy-Lee-retained producer fees (front and backend, net of third party producers' rights, legal, accounting and agency commissions) on all new projects set up (where substantial negotiations have taken place) during the Term for Roy ("Lee Projects") and (ii) On all new "Contract Producer Projects" (from producers ["Contract Producers"] who have been provided overhead in lieu of rent in the subleased space – determined in ad hoc negotiations, but historically not more than 50% of an enhanced fee generated by Roy through his bargaining power) set up during the Term, 20% of the retained Contract Producer fees (front and backend, net of third party producers' rights, legal, accounting and agency commissions). Payment of such amount shall continue after the Term on all Contract Producer Projects (including sequels to such projects – the term "remake" shall be included within the word "sequel" throughout this agreement) set up during the Term. Sequels to Lee Projects, which sequels are produced after the expiration of the Term shall be excluded (note: if Lee is making a "sequel" to an existing film during the Term, such project is not an excluded sequel under this deal) . JM-developed/ originated projects ("JM Projects") would result in a 50-50 split of the net producer fee. There would be no fee sharing with JM on projects set up before the Term (which projects are listed on Exhibit A attached hereto). Notwithstanding the foregoing, as to Lee Projects only, above 20% drops to 10%, prospectively at such time as JM is fully recouped (as to

JM's unreimbursed capital contributions set forth in Paragraph B above) plus 20%, after the Term (unless prior to the expiration of the Term, revenues received by JM are otherwise sufficient to generate such level of recoupment plus 20% for the balance of the maximum capital contributions then remaining for the entire Term, in which event such reduction in participation shall occur at such earlier time). With the exception of the existing overhead payments in the current WB deal (or any other first or second-look type deal) which may be retained 100% by Lee. If there are direct overhead reimbursements to either party during the Term related to individual Lee Projects or Contract Producer Projects, these should be applied to reduce the overhead (described in Paragraph B above) or to recoup (ratably based on the respective level that JM and Lee are then unrecouped) any then-unrecouped overhead contributions. Additionally, should Lee elect to pursue television series or long-form production (as a producer, executive producer or similar capacity) during the Term, Lee shall consider involving JM and JPM in such activities in good faith.

E. **Film Screen and Paid Ad Credit Benefits to JPM:** During the Term: on projects produced under the existing WB deal,[1] JPM to be the designated executive producer. Commercially reasonable efforts to get JPM at least executive producer on all feature projects not set up through the WB deal (most studios will follow WB precedent, but don't expect credit on projects heavily laden with existing executive producer and/or producer credits or projects which Roy did not set up but where he is subsequently "invited" to join the project). The JPM executive producer credit is required for any film set up during the Term under the existing WB 1st look agreement referenced above (as it may be amended) on which JM is entitled to participate financially per D above (and the credit should also be accorded as to any production that was previously set under the new existing WB deal even if there is no financial participation to JPM in connection therewith – i.e., film projects set up after the commencement of the new WB deal but before the commencement of this agreement) and good faith efforts to accord such or better credit elsewhere and, subject to studio approval, on sequels to Lee Projects where JM had a right to participate financially on the original production. Shared producer/production credit on all JM Projects and as JM/JPM builds a reputation, will use good faith efforts to upgrade the executive producer credit to a full producer credit.

F. **Additional Benefits/Issues:** JPM to be introduced to the film community at the highest levels. JM shall be allocated its pro rata portion of deductions for expenses paid by its contributions and its portion of revenues indicated above. Lee shall cause his accountants to prepare federal, state and local partnership income tax returns and appropriate K-1s to reflect the foregoing.  JM shall have normal audit and accounting rights and shall be provided copies of studio statements, financial reports, etc. when

---

[1] Lee's existing first look WB deal: starting 9-7-10 for two years ($250K overhead contribution in year one, $275K in year two and $300K/yr in the third optional year, recouped against budgets and not fees) with an option with WB for a third year includes: (i) right to designate an executive producer and (ii) $1.5M cash producer fee against an escalating 3% of so-called first dollar gross (note: studio can require a modification as a condition to greenlight).

received and accompanied by any applicable payments to which JM is entitled.  Lee and JM shall take such other actions appropriate to carry out the terms set forth above.

G. **Miscellaneous:** All of JM's obligations hereunder are expressly conditioned on (i) Lee's remaining primarily in the business of producing film and television productions without circumvention of this agreement and (ii) Lee compliance with all of the material provisions hereof. Notwithstanding the foregoing, nothing herein (or in connection herewith) shall be deemed to (i) guarantee that Lee shall in fact be successful in setting up and producing motion picture productions as contemplated hereunder, (ii) proscribe or prevent Lee from setting up such motion picture productions hereunder, (iii) be construed as preventing or otherwise prohibiting Lee from setting up or producing any project. This agreement shall not be construed so as to favor one party's interpretation over that of another hereunder.

The signatures below shall represent a binding agreement to the above.

RL Films2, Inc.

By: _____

Its: _____

The John Powers Middleton Company LLC

By: _____

Its: _____

Date: September  27, 2010

# EXHIBIT B

December 16, 2013

RL Films2, Inc.
c/o Stone Meyer Genow
Smelkinson & Binder, LLP
9665 Wilshire Blvd., Fifth Floor
Beverly Hills, CA 90212
Attn: Rick Genow, Esq.

Re:   **John Powers Middleton Company LLC / RL Films2, Inc. Agreement**

Dear Rick:

Reference is made to that certain fully executed 3 page agreement dated September 27th, 2010 between The John Powers Middleton Company LLC ("JM") and RL Films2, Inc. ("RL"), which such document is attached hereto as Exhibit "A" (the "Agreement").

This will confirm that JM and RL have agreed to amend the Agreement as follows:

1.     The Term shall be extended for a three (3) year period commencing January 1, 2014 and expiring on December 31, 2016 ("Extended Term"). The period from October 1, 2010 through December 31, 2013 shall be referred to herein as the "Initial Term". The Initial Term and Extended Term shall collectively be referred to as the "Term".

2.     All terms of the Agreement shall continue to apply during the Extended Term subject to the following:

(a)     During the Extended Term, RL will rent mutually acceptable office space (the "Office Space"). The parties acknowledge that RL is no longer renting the office space on Civic Center Drive as referenced in paragraph A. of the Agreement provided the provisions of Paragraph B. and C. of the Agreement shall be deemed to apply to the Office Space during the Extended Term. In the event at any time during the Extended Term, JM does not approve the office space, JM shall have the right to terminate the Agreement on thirty (30) days advance written notice, in which event the Extended Term shall be deemed to have expired as of the effective date of such written notice of termination.

RL Films2, Inc.
c/o Stone Meyer Genow
Smelkinson & Binder, LLP
December 16, 2013
Page 2

(b)    Regarding paragraph D. of the Agreement, the last sentence shall be deleted and the following inserted in its place:  Lee projects and JM projects hereunder shall be deemed to apply not only to feature film projects, but also on a prospective basis to those television/SVOD projects set up during the Extended Term (e.g., series, miniseries, MOWs), with the same financial terms and conditions for feature projects under such paragraph D. applying to television/SVOD projects.  For clarification, JM's entitlement to participate in Roy Lee – retained producer fees (front and backend; fixed and contingent) from television/SVOD projects shall only apply to such television/SVOD projects set up by Lee during the Extended Term, whereas such participation for feature projects shall apply to those projects set up by Lee both during the Initial Term and Extended Term.  For clarification, the applicable sharing of so-called "producer fees" from all projects covered under the Agreement shall apply to all compensation (i.e., front and backend; fixed and contingent; net of third party producer, agency, attorney and accounting fees).  For clarification, in paragraph D. of the Agreement, line 14, the word "making" shall be replaced with "developing".  Further, in paragraph D., line 16, the reference to "net producer fee" shall be clarified to mean both front and backend compensation (i.e., fixed and contingent).  Notwithstanding the foregoing or anything contained herein to the contrary, for recoupment purposes in connection with paragraph D., the Initial Term and Extended Term shall be one accounting period for purposes of calculating the applicable compensation split for feature projects, but for purposes of calculating the applicable split with respect to television/SVOD projects, the Initial Term and Extended Term shall not be cross-collateralized.

(c)    Regarding paragraph E. of the Agreement, for clarification, RL shall use commercially reasonable efforts to get JPM also paid and excluded ad benefits for the specified on-screen executive producer credits for feature projects under the Agreement.  Further, RL shall use commercially reasonable efforts to get JPM executive producer credit (or otherwise, the next "best" credit), subject to network approval, on all Lee Projects for television/SVOD set up during the Extended Term.  For clarification, with respect to JM Projects (as specified in the Agreement) for features falling under the Agreement, there shall be shared producer credits between JM/JPM and RL/Lee; with respect to JM Projects for television/SVOD falling under the Agreement, there shall be shared executive producer credits between JM/JPM and RL/Lee.

(d)    For purposes of clarification, the provisions of Paragraphs D and E of the Agreement shall continue to apply post-Term with respect to any projects set up

RL Films2, Inc.
c/o Stone Meyer Genow
Smelkinson & Binder. LLP
December 16, 2013
Page 3

during the Initial and Extended Terms (and/or otherwise falling under the terms of the Agreement during the Initial and/or Extended Terms). except to the extent abandoned or placed in turnaround. and subject to the exclusion in the Agreement of sequels not developed during the Term. Further. the third through fifth sentences of Paragraph F shall also survive following the expiration of the Term.(e)          For purposes of clarification, this Agreement shall be non-exclusive for JM and JPM, and nothing contained therein or herein shall prohibit or otherwise restrict JM and/or JPM from entering into any third party agreement regarding. and/or otherwise setting up with any third party, any feature film. television/SVOD and/or other entertainment projects during the Term.

(f)    For clarification. in paragraph D. of the Agreement, line 25. the words "existing" and "current" shall be deemed deleted.

Except as expressly set forth herein. all other terms and conditions of the Agreement shall remain in full force and effect and may not be further modified except by a writing signed by the parties hereto.

The signatures below shall represent a binding agreement by RL Films2, Inc. and The John Powers Middleton Company LLC.

This amendment may be executed in any number of counterparts, each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument.

Best regards.

Sincerely,

JARED E. LEVINE

AGREED TO AND ACCEPTED:

RL Films2, Inc.

By: _____
Its: Owner / President
Date: December 20, 2013

The John Powers Middleton Company LLC

By:_____
Its:_____
Date:_____

Dec. 19. 2013  8:08PM                                                    No. 1349   P. 4

RL Films2, Inc.
c/o Stone Meyer Genow
Smelkinson & Binder, LLP
December 16, 2013
Page 3

during the Initial and Extended Terms (and/or otherwise falling under the terms of the Agreement during the Initial and/or Extended Terms), except to the extent abandoned or placed in turnaround, and subject to the exclusion in the Agreement of sequels not developed during the Term. Further, the third through fifth sentences of Paragraph F shall also survive following the expiration of the Term. (e)     For purposes of clarification, this Agreement shall be non-exclusive for JM and JPM, and nothing contained therein or herein shall prohibit or otherwise restrict JM and/or JPM from entering into any third party agreement regarding, and/or otherwise setting up with any third party, any feature film, television/SVOD and/or other entertainment projects during the Term.

(f)     For clarification, in paragraph D. of the Agreement, line 25, the words "existing" and "current" shall be deemed deleted.

Except as expressly set forth herein, all other terms and conditions of the Agreement shall remain in full force and effect and may not be further modified except by a writing signed by the parties hereto.

The signatures below shall represent a binding agreement by RL Films2, Inc. and The John Powers Middleton Company LLC.

This amendment may be executed in any number of counterparts, each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument.

Best regards.

Sincerely,

JARED E. LEVINE

AGREED TO AND ACCEPTED:

RL Films2, Inc.                              The John Powers Middleton Company LLC

By:_____                  By: _John Powers Middleton_
Its:_____                 Its: _Member_
Date:_____                 Date: _12/19/13_

**Proposed Terms Between The John Powers Middleton Company LLC ("JM"), an entity owned by John P. Middleton ("JPM"), & RL Films2, Inc., an entity owned by and providing the services of Roy Lee ("Lee" which shall include Roy Lee and any Lee-controlled entity)**

A. **Sublease:** Lee will sublease 9348 Civic Center Drive, Mezzanine, Beverly Hills, CA 90210, approximately 4,800+ square feet. A three year three month (10-1-10 through 12-31-13) sublease from Spitfire Holdings, which is moving. Spitfire would be subsidizing at $0.50/sq. ft, with a starting rental of $17.5K/month, $3.65 sq. ft., $210K/yr, rising to a little less than $19.2K/month in year three. Parking is modest.

B. **Capital Contributions** by JM for Overhead : JM's obligation is, subject to Lee's performance of Lee's material obligations hereunder, guaranteed for 3 and 1/4 years (firm, beginning 10-1-10, assuming the above sublease is entered into – the "Term") ) at 50% of aggregate overhead (100% is estimated at between $450K-$600K per year), but JM's obligation is not to exceed $300K per year (or allocable portion for periods less than a year) . Overhead expenses, which shall be paid proportionately, monthly and in advance, are for rent of the above subleased space, clerical expenses and other operating costs per good faith & reasonable budget (but no personal payments to either Lee or JPM). No development fund.

C. **Office Benefits to JM:** JM will be entitled to one first class office (and access to staff/facilities) at the subleased space during the Term. JM and Lee would each be entitled to 50% of any payments by any "cash paying" subtenants during the Term.

D. **Financial Benefits to JM:** Lee will pay or cause to be paid to JM (i) 20% of the Roy-Lee-retained producer fees (front and backend, net of third party producers' rights, legal, accounting and agency commissions) on all new projects set up (where substantial negotiations have taken place) during the Term for Roy ("Lee Projects") and (ii) On all new "Contract Producer Projects" (from producers ["Contract Producers"] who have been provided overhead in lieu of rent in the subleased space – determined in ad hoc negotiations, but historically not more than 50% of an enhanced fee generated by Roy through his bargaining power) set up during the Term, 20% of the retained Contract Producer fees (front and backend, net of third party producers' rights, legal, accounting and agency commissions). Payment of such amount shall continue after the Term on all Contract Producer Projects (including sequels to such projects – the term "remake" shall be included within the word "sequel" throughout this agreement) set up during the Term. Sequels to Lee Projects, which sequels are produced after the expiration of the Term shall be excluded (note: if Lee is making a "sequel" to an existing film during the Term, such project is not an excluded sequel under this deal) . JM-developed/ originated projects ("JM Projects") would result in a 50-50 split of the net producer fee. There would be no fee sharing with JM on projects set up before the Term (which projects are listed on Exhibit A attached hereto). Notwithstanding the foregoing, as to Lee Projects only, above 20% drops to 10%, prospectively at such time as JM is fully recouped (as to

JM's unreimbursed capital contributions set forth in Paragraph B above) plus 20%, after the Term (unless prior to the expiration of the Term, revenues received by JM are otherwise sufficient to generate such level of recoupment plus 20% for the balance of the maximum capital contributions then remaining for the entire Term, in which event such reduction in participation shall occur at such earlier time). With the exception of the existing overhead payments in the current WB deal (or any other first or second-look type deal) which may be retained 100% by Lee. If there are direct overhead reimbursements to either party during the Term related to individual Lee Projects or Contract Producer Projects, these should be applied to reduce the overhead (described in Paragraph B above) or to recoup (ratably based on the respective level that JM and Lee are then unrecouped) any then-unrecouped overhead contributions. Additionally, should Lee elect to pursue television series or long-form production (as a producer, executive producer or similar capacity) during the Term, Lee shall consider involving JM and JPM in such activities in good faith.

E. **Film Screen and Paid Ad Credit Benefits to JPM:** During the Term: on projects produced under the existing WB deal,[1] JPM to be the designated executive producer. Commercially reasonable efforts to get JPM at least executive producer on all feature projects not set up through the WB deal (most studios will follow WB precedent, but don't expect credit on projects heavily laden with existing executive producer and/or producer credits or projects which Roy did not set up but where he is subsequently "invited" to join the project). The JPM executive producer credit is required for any film set up during the Term under the existing WB 1st look agreement referenced above (as it may be amended) on which JM is entitled to participate financially per D above (and the credit should also be accorded as to any production that was previously set under the new existing WB deal even if there is no financial participation to JPM in connection therewith – i.e., film projects set up after the commencement of the new WB deal but before the commencement of this agreement) and good faith efforts to accord such or better credit elsewhere and, subject to studio approval, on sequels to Lee Projects where JM had a right to participate financially on the original production. Shared producer/production credit on all JM Projects and as JM/JPM builds a reputation, will use good faith efforts to upgrade the executive producer credit to a full producer credit.

F. **Additional Benefits/Issues:** JPM to be introduced to the film community at the highest levels. JM shall be allocated its pro rata portion of deductions for expenses paid by its contributions and its portion of revenues indicated above. Lee shall cause his accountants to prepare federal, state and local partnership income tax returns and appropriate K-1s to reflect the foregoing. JM shall have normal audit and accounting rights and shall be provided copies of studio statements, financial reports, etc. when

---

[1] Lee's existing first look WB deal: starting 9-7-10 for two years ($250K overhead contribution in year one, $275K in year two and $300K/yr in the third optional year, recouped against budgets and not fees) with an option with WB for a third year includes: (i) right to designate an executive producer and (ii) $1.5M cash producer fee against an escalating 3% of so-called first dollar gross (note: studio can require a modification as a condition to greenlight).

received and accompanied by any applicable payments to which JM is entitled. Lee and JM shall take such other actions appropriate to carry out the terms set forth above.

G. **Miscellaneous:** All of JM's obligations hereunder are expressly conditioned on (i) Lee's remaining primarily in the business of producing film and television productions without circumvention of this agreement and (ii) Lee compliance with all of the material provisions hereof. Notwithstanding the foregoing, nothing herein (or in connection herewith) shall be deemed to (i) guarantee that Lee shall in fact be successful in setting up and producing motion picture productions as contemplated hereunder, (ii) proscribe or prevent Lee from setting up such motion picture productions hereunder, (iii) be construed as preventing or otherwise prohibiting Lee from setting up or producing any project. This agreement shall not be construed so as to favor one party's interpretation over that of another hereunder.

The signatures below shall represent a binding agreement to the above.

RL Films2, Inc.

By: _____
Its: Owner

The John Powers Middleton Company LLC

By: John Powers Middleton
Its: Member

Date: September 27, 2010

**PROOF OF SERVICE**
*John P. Middleton, et al. v. Roy Lee, et al.*
**Case No. 19STCV30580**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 1875 Century Park East, 23rd Floor, Los Angeles, CA 90067-2561. On December 30, 2020, I served the following document(s) described as:

**DEFENDANTS ROY LEE AND RL FILMS2, INC.'S THIRD AMENDED CROSS-COMPLAINT AGAINST PLAINTIFFS JOHN P. MIDDLETON AND THE JOHN POWERS MIDDLETON COMPANIES, LLC FOR:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**
3. **INTENTIONAL MISREPRESENTATION;**
4. **NEGLIGENT MISREPRESENTATION;**
5. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; AND**
6. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**AND DEMAND FOR JURY TRIAL**

on the interested parties in this action as follows:

Martin D. Singer, Todd S. Eagan, Jake A. Camara
Lavely & Singer
2049 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 556-3501; Facsimile: (310) 556-3615
Email: mdsinger@lavelysinger.com
Email: teagan@lavelysinger.com
Email: jcamara@lavelysinger.com
**Counsel for Plaintiffs John P. Middleton and
The John Powers Middleton Companies, LLC**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused the above-listed document(s) to be sent from e-mail address dbeatty@birdmarella.com to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 30, 2020, at Los Angeles, California.

_Debbey Beatty_
Debbey Beatty

3691201.1

Page 33

PROOF OF SERVICE



I certify that this is a true and correct copy of the
original on file in this office consisting of 33 pages

SHERRI R. CARTER, Executive Officer / Clerk of the
Superior Court of California, County of Los Angeles

Date: NOV 23 2022   By: _____ Deputy
                          D. WADE